496 P.2d 594

**Frands THUDE, Appellant-Cross-Appellee,**

**v.**

**UNITED DAIRYMEN OF ARIZONA, an Arizona corporation, Appellee-Cross-Appellant.**

**No. 1 CA–CIV 1520.**

Court of Appeals of Arizona,
Division 1,
Department A.

May 4, 1972.

Rehearing Denied June 5, 1972.
Review Denied July 13, 1972.

Stockton & Hing, by Henderson Stockton, Phoenix, and Hill & Savoy, by John P. Otto, Phoenix, for appellant-cross-appellee.

Evans, Kitchel & Jenckes, by David Wm. West and Harold J. Bliss, Jr., Phoenix, for appellee-cross-appellant.

DONOFRIO, Judge.

This appeal and cross-appeal are from a judgment of $10,000 for compensatory damages in favor of plaintiff-appellant, cross-appellee Frands Thude, and against United Dairymen of Arizona (herein UDA), defendant-appellee, cross-appellant. Plaintiff and defendant made timely motions for a new trial which were denied, and this appeal followed. The parties will be referred to as they appeared in the trial court.

The complaint states that the cause of action arose out of alleged wrongful conduct of the defendant in refusing to deliver a milk base for 8,465 pounds to the plaintiff, thereby causing damages of $12.-

00 per pound, or $101,580. Before an exhaustive statement of the facts is set out, we believe it would facilitate the comprehension of the circumstances out of which this case arose to define the term "milk base".

UDA was organized[1] in order to facilitate the marketing of milk, the primary purpose being the avoidance of both spoilage and surplus. When a member of UDA is issued a milk base he is thereby assured that the association will accept the amount of milk which the base represents (measured in pounds per day) and market said base at a set price (known as class 1 or blend price) established by the milk market administrator. Any milk in excess of the base will be sold at a somewhat lower price.

The pertinent provisions of the contract which relate to the definition of "milk base" are as follows:

"THAT, WHEREAS, the member *owns, possesses, or has control* of dairy cows and desires to have the milk or dairy products of such cows, and such other cows as he may hereafter acquire or control at any time during the term of this agreement, sold and disposed of by the Association. (Emphasis supplied.)

"NOW, THEREFORE, in consideration of the premises and of the mutual obligations of the parties and in further consideration of the obligations of other members, each to the other, executing similar agreements, the parties hereto agree that:

"FIRST: During the term of this agreement, the member agrees to deliver all Grade A milk produced by him to such person, or persons, and at such place, or places, and in such manner as shall be designated by the association. It is specifically understood that any milk or milk products for home consumption is not intended for inclusion herein.

"SECOND: The association hereby agrees to use its best efforts to market the members milk and dairy products in such manner as the association shall deem to be to the best advantage of the member, and all other members of the association signing similar membership agreements.

"THIRD: The member hereby constitutes the association his sole and exclusive agent for the purpose of handling and marketing such milk and dairy products, together with the milk and dairy products delivered by other members of the association signing similar membership agreements."

Plaintiff Frands Thude, the owner and operator of AnnaRosa Dairy in Chandler, and a dairyman up until December 1962, joined Federated Producers Association (herein referred to as Federated) at its inception in 1960 and remained a member until July 28, 1966 when he terminated his membership. Federated functioned as a cooperative milk marketing association, as does UDA. In August 1966 Federated disbanded and all members of the defunct Federated were given the opportunity to join UDA. Plaintiff owned shipping rights in Federated that amounted to 9,200 pounds of milk daily. When Federated contracted with UDA in July 1966, by the terms of that contract the members of Federated who joined UDA were assigned a UDA milk base proportional to the base they owned in Federated. The terms of the Federated-UDA contract were identical to the contract provisions set out above, in that members of Federated had to "own, possess or control" cows in order to obtain a milk base. In most cases the UDA base was 90% of the base Federated issued to its members. Thude never did receive this base after signing the agreement with UDA on August 29, 1966. It does appear that he shipped milk with UDA for a period of time in September 1966 before UDA refused to market any further quantities of milk his dairy farm produced. Plaintiff first learned that his membership was terminated by the board of directors of UDA on December 15, 1966 in a letter

---

1. Pursuant to A.R.S. § 10–701 et seq.

sent to him by the general manager of UDA on January 11, 1967, which stated in part:

"On December 15, 1966, the Board of Directors of United Dairymen of Arizona terminated your Membership Agreement in that Association.

"The reason for the termination was that at the time you signed the Membership Agreement you did not own the base or herd of cows being operated under the name AnnaRosa Dairy, but, in fact, had sold your interest in the AnnaRosa Dairy to Manuel Silva.

"Had these facts been known to the Association at the time your Membership Application was presented to the Board of Directors, it would not have accepted you as a member."

On December 1, 1962 plaintiff sold to Manuel Silva 150 dairy cows on a conditional sale contract for a total price of $90,000 of which $50,000 was received by plaintiff as a down payment. Title was to remain in Thude's name until the entire remainder of the obligation was paid. Included in this price were the shipping rights Thude enjoyed with Federated. Until Federated ceased to exist Silva was able to ship the milk through that organization although the shipping rights remained in Thude's name as security for the unpaid balance.

The milk checks from Federated were received by Thude and assigned to the Arizona Bank against the $40,000 which Silva borrowed from the bank to make a down payment to Thude. Subsequently a total of 231 cows were sold to Silva by Thude, and Silva signed a new promissory note and chattel mortgage covering all the cows once the obligation to the Arizona Bank was paid. Throughout the entire period Thude, doing business as AnnaRosa Dairy, was receiving the milk checks from Federated. There appears to be a factual dispute as to whether the officers of UDA understood Silva's relationship with Thude.

In September 1966 Silva sold at auction 200 cows, and the proceeds from the sale were to have been turned over to Thude. Defendant UDA refused to transfer plaintiff's base to the individual purchasers, all of whom were members of UDA. There was testimony by Thude at trial that Silva would have received all the money had UDA approved the transfer of the base to the new purchasers.

Additional facts necessary for determination of this appeal follow. Silva brought suit against Thude in September 1967 because of plaintiff's inability to deliver a milk base as bargained for in their contract. The litigation was settled when plaintiff paid Silva $10,000. There was evidence that Silva had owned a UDA base, but had resigned and signed a noncompetitive agreement with the defendant in November 1962.

The issues raised on appeal are as follows:

1. Was defendant obligated to issue to plaintiff a milk base by reason of defendant's membership agreements with Federated and plaintiff?

2. What is the proper measure of damage for defendant's failure to honor plaintiff's membership and issue a milk base?

3. Is the issuance of a milk base a proper subject for specific performance?

4. Are punitive damages recoverable by plaintiff under the facts as alleged?

■ The crucial determination is whether Thude, pursuant to the terms of the contract he executed with UDA, did "own, possess or control" the cows which were producing the milk. The following testimony elicited from plaintiff is enlightening on the issue of possession and control:

"Q All right. Now, when these cows were moved over, [to Silva's farm in Laveen] did you have anything to do with the milking of the cows?

"A No.

"Q Did you have anything to do with hiring of the employees for the operation of the dairy?

"A No.

"Q Did you have anything to do with the managing of the cows?

"A No, unless I went over and see they were taken care of.

"Q The only interest you had in those cows at that time was you had a security interest in them, and if he didn't pay these people, then you wanted them back, is that right?

"A Yes.

    *     *     *     *     *     *

"Q BY MR. BLAKE: At the time you signed the membership contract, Mr. Silva was still milking the cows, wasn't he?

"A Yes.

    *     *     *     *     *     *

"Q Now, did Silva advertise the cows for sale?

"A Yes.

"Q About what time did he advertise the cows for sale?

"A Well, I couldn't tell exactly—around the first of September, around the first of September. [1966]

    *     *     *     *     *     *

"Q Do you know—did you know that—did he [Silva] discuss with you the fact that he was going to offer the cows for sale?

"A No.

"Q Did he discuss with you that he was going to offer the base for sale?

"A No.

"Q He, Silva, put the ad in the paper, did he not?

"A Yes.

"Q And were the cows sold?

"A Yes."

It is apparent from the record that Thude had no control over the herd from a point in time that they were delivered to Silva's dairy farm in Laveen. Regarding ownership rights of a secured party, we feel the most persuasive cases hold that under a conditional sale contract the seller reserves legal title to the chattel solely as security for payment or performance by the buyer and, absent any forfeiture by the buyer, he has no right of possession. See Schnitzer v. Fruehauf Trailer Co., 283 App.Div. 421, 128 N.Y.S.2d 242, affirmed without opinion, 307 N.Y. 876, 122 N.E.2d 754 (1954); Olin Mathieson Chem. Corp. v. Southwest Casualty Co., 149 F.Supp. 600 (W.D.Ark.1957); Landis Machine Co. v. Omaha Merchants Transfer Co., 142 Neb. 389, 6 N.W.2d 380, 9 N.W.2d 198 (1943); Luke v. Mercantile Acceptance Corp. of Cal., 111 Cal.App.2d 431, 244 P.2d 764 (1952).

In Bowden v. Bank of America, 36 C.2d 406, 413, 414, 224 P.2d 713, 717 (1950), the court quoted with approval from County of San Diego v. Davis, 1 Cal.2d 145, 33 P.2d 827 (1934), as follows:

> "'In a conditional sale, the title in the seller is for security only, to assure the payment of the purchase price. It carries with it none of the ordinary incidents of ownership. The buyer has the possession and use of the property to the complete exclusion of the seller, subject only to the seller's remedies in case of default. Both in a practical and a legal sense the buyer is the beneficial owner.' * * *" (Emphasis supplied.) 247 P.2d at 717.

Also in Bowden is the following quote from Walker v. Houston, 215 Cal. 742, 12 P.2d 952 (1932):

> "'The buyer has the full right of possession and use unless he defaults, and may secure title by performance of his obligation without any further assent by the seller. The sole interest of the seller is in the receipt of the price, and his reserve title cannot be used for any other purpose. * * *'" (Emphasis supplied.) 224 P.2d at 718.

■ Plaintiff contends that UDA had previously transferred milk base without

the accompanying sale of cows. The record does substantiate this assertion. However, the uncontroverted testimony of Robert G. Lyle, former manager of UDA, was that during his tenure there never was a transfer of base to a person who was not a UDA member. In the instant case, given this information, we cannot say that a denial of a transfer of base to Silva by the Board of Directors was arbitrary, especially given the fact that Silva had been a UDA member and resigned and signed a noncompetitive agreement with the defendant on November 28, 1962, to be in full force and effect for seven years.

■ Plaintiff further argues that the auction sale which Silva initiated resulted in a sale of cows to members of UDA and the base should have been transferred because it ultimately would have ended up in possession of other UDA members. We do not agree for two reasons. The testimony of plaintiff on redirect examination establishes that the proceeds from the sale of the milk base would have been received by Silva, a result we consider anomalous given the fact that Silva signed the noncompetitive agreement with the defendant. Secondly, we have concluded upon careful examination of the record that Thude did not, in reality, have the requisite ownership, possession or control of the herd in order to qualify for a UDA milk base. Therefore it becomes obvious that he could not transfer to Silva rights to which he was not entitled.

For the aforementioned reasons, we hold that the refusal of the defendant to issue a milk base to the plaintiff was entirely proper. This conclusion is dispositive of the appeal and the remaining questions need not be discussed.

The judgment of the trial court is modified by deleting the judgment in favor of plaintiff Thude so that the judgment is wholly in favor of the defendant. As modified, the judgment is affirmed.

STEVENS, P. J., and CASE, J., concur.