Mrs. J. D. **VAN HUSS**, a widow,
Plaintiff,

v.

**ASSOCIATED MILK PRODUCERS, INC.**
**and Bob Buchanan, Defendants.**

Civ. A. No. CA–7–74–13.

United States District Court,
N. D. Texas,
Wichita Falls Division.

June 25, 1976.

Perry Wesbrooks, Wichita Falls, Tex., for plaintiff.

David T. Maddox and James P. Bailey, Houston, Tex., Glynn Purtle, Wichita Falls, Tex., for Associated.

Elmer Parish, Wichita Falls, Tex., for Buchanan.

## MEMORANDUM OPINION AND ORDER OF DISMISSAL

ROBERT M. HILL, District Judge.

The motion to dismiss filed by the defendant Associated Milk Producers, Inc. (AMPI) came on for consideration before the Honorable Robert M. Hill, United States District Judge. After consideration of the motion and the lengthy arguments of counsel, the court is of the opinion that the motion should be sustained.

The question presented in the motion is whether the so-called "base transfer" used by AMPI as a means for distributing proceeds of milk sales to its members is a security as that term is defined in the Securities Act of 1933 and the Securities Exchange Act of 1934. Although the plaintiff (Van Huss) has requested additional discovery concerning class action aspects of the case, it is admitted that the considerable discovery conducted thus far has completed the development of the factual background regarding the jurisdictional question raised in the motion to dismiss.

### I. Milk Production and Regulations

To understand the issue raised one needs an elementary familiarity with the inherent problems in marketing milk and the regulatory system which has developed in response to these special problems.[1]

---

1. The motion has required the court to "traverse the labyrinths of the federal milk marketing regulations provisions." Zuber v. Allen, 396 U.S. 168 (1969). The Zuber opinion contains a helpful description of milk marketing problems upon which the court has relied.

Initially, it is necessary to realize that because cows produce more milk in the summer than in the winter, milk production has seasonal variations. The demand for milk is also characterized by seasonal variations that generally follow the school year; however, these variations in supply and demand do not correlate. Production is lowest when demand rises to its highest level. To satisfy winter demand, therefore, the dairy farmer must maintain a herd which will produce more than the market demands during summer months. Also, there are daily disparities between the supply and demand for milk. Both factors lead inevitably to the accumulation of substantial milk reserves on a daily and seasonal basis. Since milk is a highly perishable product which can be stored for only a short time and cannot be shipped any great distance, any excess accumulation creates a serious problem for the farmer. The result of such variations in supply and demand and the farmer's inability to stockpile his product or hold it off the market is that an unregulated market for milk is characterized by highly volatile prices placing the farmer in a weak bargaining position in the market place. The dairy farmers' attempts to cope with these special problems of supply and demand, storage, and price variations largely explain the history of milk marketing in the United States and the regulatory system that has developed. First, the farmers succeeded in persuading Congress to enact legislation to protect farmers against some of their special problems. Agricultural Marketing Agreement Act of 1937, 7 U.S.C. § 601 *et seq.*[2]

The formation of milk cooperatives like AMPI was another response to the milk farmers' special problems. In the cooperative the farmers agree to pool their milk and thereby increase their market power.

AMPI collects and markets the milk and then returns the proceeds to its members. The controversy now before the court concerns one means AMPI uses to account to its members for the proceeds of its sales.

Accounting for proceeds is complicated by the fact that milk is categorized and sold according to its ultimate use. Class I milk, for example, is the highest quality milk and is sold for use in fluid form. Other classifications are reserved for use in dairy products like cheese, butter, and ice cream. Class I milk ordinarily brings higher prices than other classifications. Since the cooperative pools and sells its members milk production as a unit, a problem arises of how to divide the proceeds of the cooperative's milk sales among its members. The simplest method for allocating sales proceeds is to take the total proceeds, divide by the total number of pounds of milk sold, and thereby calculate a weighted average price for all milk, regardless of classification.[3] The weighted average price is known in the industry as a blend price.

The principal disadvantage with the blend-price allocation method is a classic in agricultural economics. Because each farmer has a guaranteed market at a minimum price and because an individual farmer's production is too small a part of total production to have an appreciable impact on supply, he has no incentive to limit production in response to changes in supply and demand. The aggregate effect of the individuals' production incentives created by this system is to encourage overproduction. The effect of such depends upon the nature of the market. In a regulated market like milk the overproduction means first that there is too much "surplus" milk, i. e., non-class I, a condition which tends to reduce the blend price to the minimum price set by

2. Pursuant to that legislation, the government maintains a stable minimum price for milk. Farmers are thus guaranteed a market for their product at a government regulated price.

3. A simple hypothetical example will illustrate the principle: assume farmer A produces seventy-five pounds of milk and farmer B, twenty-five pounds. If the cooperative sells fifty pounds of milk at a higher class I price of twenty cents per pound and fifty pounds of other classes at ten cents per pound, the average price would be fifteen cents per pound. Farmer A would receive $11.25 from the cooperative and farmer B, $3.75. Each farmer thus shares equally in the market's division of the sales for each class.

the government. From that point additional production means that if there were a market price, it would be below the minimum price and the government therefore is indirectly subsidizing milk production.

The shortcomings with the blend price allocating mechanism led to more complicated refinements. One such refinement is the so-called "Base Plan." In general, a base plan attempts to make each farmer subject to the market forces that shape price and allocation. Each farmer is assigned an amount of base, measured in pounds, which entitles that farmer to sell that amount of Class I milk at the higher Class I prices. Any "over-base" milk the farmer sells will be at the lower surplus milk prices. The individual can thus establish his own blend price unencumbered by his neighbors' production decisions. Base, therefore, is a marketing privilege similar in concept to what a rationing system does for buyers when supply is short. As a marketing privilege, base, like a ration coupon, obtains a value of its own that roughly reflects the disparity between base price and surplus price.[4]

## II. Plaintiff's Cause of Action and the Base Plan in Issue

When the plaintiff (Van Huss) decided to expand her dairy business, she bought additional cattle from defendant Buchanan. At the same time she bought 2,000 pounds of base at $20.00 per pound from Buchanan which allowed her to sell a portion of her expanded production at Class I prices. Van Huss contends that base is a "security" and that Buchanan failed to inform her of certain matters and thereby violated the federal securities laws. For example, Van Huss argues that due to Buchanan's insider status, he had advance knowledge of AMPI amendments to the base plan which had the

predictable effect of lowering the market value of base. Thus, Buchanan allegedly profited unfairly by having made a sale with this inside information at Van Huss' expense. AMPI argues that base is not a security, and therefore the federal securities laws do not pertain to base transfer transactions.

## III. The Base Plan in Issue

The base plan in issue first became effective August 1, 1968, as the plan of a cooperative known as Milk Producers, Inc. (MPI). Shortly thereafter MPI was merged into AMPI and the plan was continued as AMPI's. Since that time the plan has been amended on various occasions, but the same basic plan governed the transfer about which Van Huss complains.

The members of MPI acquired their base in 1968 without cost. The cooperative merely allocated base to its members on the basis of their Class I milk production during a representative period.[5] Each month AMPI's Southern Region Supply Management Committee calculates the price for base and over-base milk through the operations of a formula as set forth in the plan. Greatly simplified, AMPI calculates the price for "base" milk by taking the cooperative's total monthly receipts less the money received from surplus milk sold.

In an ideal situation the total amount of Class I sales equals the total amount of base owned by members. If the sum of the producers' bases exceed total Class I sales, the return to producers for base milk is reduced by averaging the Class I price with the price for surplus sales.

It can be seen that the total amount of base is designed to correspond to the total sales of Class I milk in the cooperative. To take account of entry and exit from the market by buyers and producers and other

---

4. Van Huss has stated in her brief that Buchanan, another milk producer, sold base in 1972 for $15.00 to $20.00 per pound. (Van Huss brief, p. 23). Among other factors which influence the value of base are the degree to which the base system is closed to outsiders and the degree to which base may be transferred among members. *See* U. S. Dept. of Agricul-

ture, Base Plans in U. S. Milk Markets: Development, Status and Potential, Market Research Report No. 957, page 30.

5. Van Huss, for example, was allocated 876 pounds of base while Buchanan, a much larger producer, received 6,336 pounds.

changes in sales and production, the base plan provides various means, including the transfer of base, for AMPI to adjust members' base allocations. One adjustment mechanism is to make the plan "closed," i. e., to provide that a new producer can obtain base only if he either brings additional Class I sales to the cooperative's pool or he buys base from existing members.[6]

A second means for maintaining the correlation between base allocations and Class I sales is to provide for an annual review to determine if members are producing all their base milk. The AMPI plan provided that an individual member who failed to produce 80% of his base allocation during a requalification period was subject to a unilateral reduction of his base. Also, the MPI Board annually reviewed sales and were authorized to order *pro rata* increases or decreases in base.

A third means for maintaining the desired equivalency between base allocations and Class I sales is to allow base to be traded or transferred. The restriction placed on transfers is very important to the functioning of the base system and the value of base itself. In AMPI's plan, transfers were permitted only between members of the cooperative. Further, the seller of base was required to state on the standard base transfer that he intended to remain in the cooperative as a producer, or that he was selling his entire herd and would not produce Class I milk for a period of five years.

## IV. *Securities Law*

■ The legal issue before the court is whether the base transfer between Van

Huss and Buchanan was a "security." Congress intended the securities laws to have a long reach in order to effect the remedial purposes of the statute and to allow the flexibility necessary to cope with the endless ingenuity of unscrupulous, fast-talking promoters. At the same time, Congress never intended the securities laws to apply to all sales; otherwise, the detailed reporting provisions and other requirements would seriously clog everyday commerce.

■ The touchstone for determining whether a transaction involves a security is the standard stated in *S.E.C. v. W. J. Howey Co.*, 328 U.S. 293, 299, 66 S.Ct. 1100, 1103, 90 L.Ed. 1244 (1946) in which the Supreme Court defined a security as "a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." Despite criticism the *Howey* standard has survived the test of time.[7]

The crucial issue in this case is whether Van Huss' purchase of base was an investment whereby she was led "to expect profits solely from the efforts" of others. Several courts and various authorities have criticized the "solely from" requirement. Coffey, "The Economic Realities of a 'Security': Is There a More Meaningful Formula," 18 Case W.R.L.Rev. 367 (1967); Long, "An Attempt to Return 'Investment Contracts' to the Mainstream of Securities Regulation," 24 Okl.L.Rev. 135 (1971). In *S.E.C. v. Glenn W. Turner Enterprises, Inc.*, 474 F.2d 476 (9th Cir. 1973) the court ruled that "solely" was not to be taken literally or dogmatically. Still, the court was care-

---

**6.** The original MPI plan provided, "No base shall be issued to a producer going on the market after April 30, 1968, except those producers who bring additional Class I sales into the MPI pool, and their bases shall be calculated on the same basis as was used for the original MPI members. Base obtained under these conditions may not be transferred for a period of two years except with the approval of the MPI board. Producers of Grade A milk becoming members of MPI after April 30, 1968, shall be entitled only to that base which they may have obtained through transfer from other MPI members, in accordance with the rules established by the MPI Board."

**7.** The Supreme Court recently reaffirmed the *Howey* doctrine. *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975); see also *Woodward v. Metro Bank of Dallas*, 522 F.2d 84 (5th Cir. 1975), fn. 17. In *Forman* the Supreme Court recognized that certain chinks had developed in the Howey test, but the Court declined to patch the damage or even express a view on such developments. *Forman, supra* at fn. 15.

ful to make clear that the result reached in *Turner* was in the *Howey* tradition of cases. "Our holding in this case represents no major attempt to redefine the essential nature of a security. Nor does our holding represent any real departure from the Supreme Court's definition of an investment contract as set out in *Howey.*" *Turner, supra* at p. 483.

As far as this court can determine the requirement stated in *Howey* remains an important limitation preventing federal jurisdiction from extending to all claims of fraudulent business transactions. The "solely from" requirement derives from the classic example of a security, corporate stock. The purpose of this limitation was to protect investors who are not close to the day to day operations of the venture and are therefore relying on another person's management skills to enhance his investment. Such protection was intended to foster the investor's sense of well-being in his investment and thereby encourage the public to invest in business ventures, an essential feature of a capitalistic economy. On the other hand, the definition was deliberately framed to exclude situations in which the "investor" directly participated in the building of the common enterprise.

■ The *Forman, supra*, decision reflects the flexibility built into the definition of a security and indicates to this court that the most instructive means of separating securities from non-securities is to consider the features of questioned transactions in light of the essential elements of stock, the paradigm case of a security, along with the purposes reflected in the legislation.[8] In *Forman*, the court decided that "stock" in a subsidized low income housing project was not a security. The court relied on the fact that buyers of such stock did not purchase for investment purposes, but rather to secure low cost housing. The purchase contract in *Forman* contained a buy-back scheme that as a practical matter prevented the realization of "profits" from the sale of the stock. The court relied on a narrow view of profits to reach their result. A three-justice minority argued that the shares were securities because purchasers depended upon the management skills of those people who ran the project.

The "base transfer" system the court is examining is a step removed from the *Forman* situation and is that much closer to being a security. It is clear, for instance, that dairy farmers may engage in activity that resembles speculation in the buying and selling of base. The record shows that in a five year period Buchanan bought or sold base in twenty-two separate transactions.[9]

Furthermore, it is evident that AMPI members were aware of the fact that base had a market value, albeit in a limited

8. The flexibility necessary to securities law makes the determination of reasoned principles more difficult. The parties have produced a comprehensive survey of the law on this subject, but in the end one is left with the impression that he is dealing with an area of the law subject to wide variations, serious anomalies, and judicial disagreement, if not confusion. In short, the wealth of judicial writing on the subject has produced few discernible principles of decision. One commentator has characterized the statutory definition of a security as "Pandora's box of impossible dimensions." "The Importance of Economic Reality and Risk in Defining Federal Securities," 25 Hastings L.J. 219 (1974). The court has not attempted, therefore, to add a lengthy discussion of the law but nevertheless appreciates the thoroughness of the parties' briefing. Review of the law on this subject has convinced the court of the wisdom of taking stock as the example for determining the essential features of a security.

9. Plaintiff's brief, pg. 23. The record reflects the cooperative's concern that some trading of base was for speculative purposes. The minutes of the Board of Directors of MPI of May 2, 1968, at which time the base plan was adopted, contains the notation, "After discussion the Board directed the Manager to do everything possible to avoid any activity that could be considered as brokerage on bases." Also, one of the provisions of the standardized transfer form was that "the intent of the base program is not to grant a property right to members, but merely a marketing privilege as determined by the Board of Directors of AMPI." One is reminded of Shakespeare's comment, "The lady doth protest too much, methinks." Hamlet, III, ii, 242. AMPI's disclaimer has a similar ring to it.

market. As a result the AMPI Board of Directors encountered political problems from the membership when it attempted to change the base plan.[10]

■ As in *Forman,* the principal reason for buying base is not for investment purposes. The overriding purpose of owning base is to insure a higher price for the farmer's milk production. Without production, base has no value. Van Huss is engaged in the production of milk and is thereby earnestly engaged in an activity that is the single most important factor in determining the value of her base. In effect, Van Huss' base investment is an investment in her dairy farm. It cannot be denied that AMPI's business decisions, both with regard to milk sales and administration of the base system, have an impact upon the value of Van Huss' base. Early access to information about those decisions would be of value to a person considering the purchase or sale of base. For example, AMPI's original plan contained "new producer" provisions that were so restrictive that the cooperative found that new producers were making independent sales. The increase in such sales naturally concerned the cooperative, and steps were taken to ease entry into the base system. Although the purpose of such changes was to discourage independent sales, they had a predictable side-effect of lowering the market value of base held by the co-operative's existing members. It must be admitted that AMPI's ability to make such management decisions are not unlike those that the dissenting Justices found persuasive in *Forman, supra,* and if certain dicta about *Howey* in the *Turner* decision were the law, the

court is of the opinion that a different result would be required here. But the fact that one may speculate in the trading of a given commodity does not automatically stamp that commodity as a security. Similarly, the possibility of using inside information does not make a security. Both approaches elide the basic issue. There are a myriad of factors to be considered, not the least of which are the economic purposes (i. e. investment or non-investment) behind the scheme and the complainant's participation in the scheme.

One such factor the court has found persuasive in reaching its result is that the ownership of base lacks the stability characteristic of ownership of other property interests which may fairly be called securities. A stock is a fixed stake in the corporation, and management is strictly limited in the means it may adopt to adjust ownership shares without shareholder approval. Such is not the case with base. In its effort to tie base to milk production, AMPI limits transfers of base to milk producers, and transfers are voidable. If the farmer fails to produce a set percentage of his base allotment he runs the risk that AMPI will unilaterally reduce his base allotment.[11] The base plan is subject to amendment by the AMPI Board without approval of the membership. Such amendments may go to the most fundamental aspects of base, including the right to abolish the scheme. These factors differentiate base from a fixed property right which is a fundamental feature of a security.

From AMPI's point of view, base involves no capital investment and is therefore unlike a security investment. AMPI receives no income from the sale of base except for

---

10. In an article distributed to milk farmers, S. F. Howe, Southern Regional Manager of AMPI, wrote about the goals of a Class I base plan, "The fourth goal, although not intended originally, is to maintain a reasonable value of the base. This fourth goal has, at times, taken priority over the other three and it is the one that our dairy farmers are concerned about at this time." Later, he continued, "I think I can speak for the Board when I say that it is their intention that base will continue to be of value and that as economic conditions improve and

as production increases on the market, feed and price ratio gets better, and it will, then there is no reason to suspect that the price of base will not seek a higher level than it is at the present time." S. F. Howe, "Meeting Our Goals," March, 1973, page 6.

11. The Board minutes show that in some years AMPI has suspended the requalification provisions, but they nevertheless remain a part of the plan.

the transactional fee it charges, a fixed fee which does not vary with the amount of the sale. AMPI does not offer base to the public. It does not profit from its sales in any direct sense. If base were analogous to stock, AMPI would be the issuing corporation, and therefore AMPI cannot be regarded merely as a trading forum for securities like a stock exchange or broker since AMPI is the "common enterprise."

## V. *Conclusion*

On balance the court is of the opinion that AMPI's base is not a security since to realize any value from its purchase the buyer must be engaged in the activity which most directly affects its value. Also, base is not primarily an investment for speculative purposes. Further, base lacks certain fundamental economic characteristics common to securities. Finally, it is important in such cases to take an overall view of the nature of the transactions in question. The base plan system is an economically sensible response to the peculiar problems found in the milk market. There is no evidence that base was intended to be anything more than a convenient and sensible means for coping with such problems. Application of the securities laws to the system would likely hamper the useful operations of the system with no appreciable gain to the "investing public." Disclosure requirements would not encourage farmers to buy more base since base is not an investment in the normal sense but rather is a ticket to sell milk at a higher price. In these circumstances the court does not believe that Congress intended that a marketing system similar to base to be a security. At the same time the court admits that it views the issue as a "close call." It is appropriate to emphasize the "fact specific" nature of the court's result. One should be very careful in applying such decisions to other fact situations.

For the foregoing reasons the court is of the opinion that Van Huss' complaint must be dismissed.

It is so ORDERED.