782 P.2d 708

**Robert J. LUECK, dba R.J. Lueck Dairy, Ltd., Plaintiff Defendant Third–Party Plaintiff–Appellant,**

v.

**UNITED DAIRYMEN OF ARIZONA, an Arizona cooperative marketing association, Defendant Third–Party Defendant–Appellee.**

No. 1 CA–CIV 9832.

Court of Appeals of Arizona, Division 1, Department C.

June 1, 1989.

Review Denied Dec. 5, 1989.

Robbins & Green, P.A. by Robert H. Green and Brian Imbornoni, Phoenix, for

---

plaintiff defendant third-party plaintiff-appellant.

Sydney Berde & Associates, P.A. by Sydney Berde, St. Paul, Minn., and Quarles, Brady & Fannin, P.A. by Fred G. Lemberg, Phoenix, for defendant third-party defendant-appellee.

## OPINION

KLEINSCHMIDT, Judge.

Robert J. Lueck, a dairy farmer, appeals the trial court's decision granting summary judgment against him and in favor of the United Dairymen of Arizona (UDA), a cooperative milk marketing association. In broad terms, the issue on appeal is whether UDA's method of allocating the proceeds derived from the sale of its members' milk violates A.R.S. section 10–716(C). Because we interpret A.R.S. section 10–716(C) to be permissive, we find that UDA need not pay its producers the average price that it receives for the products that it sells. We therefore affirm the trial court's judgment that UDA is not in violation of the statute.

## BACKGROUND

A proper interpretation of A.R.S. section 10–716(C), the statute that is central to this case, requires an elementary understanding of how milk is marketed. We will begin with a general outline of this process.

Dairy farmers who are members of UDA contract with UDA to market their milk. Acting as an agent for its members, UDA sells the milk to "handlers," that is, to grocery stores or companies that sell milk or milk products. The handlers pay UDA according to a price scheme that the United States Department of Agriculture has developed. UDA in turn pays its members according to its "base plan" or its "overproduction program." The amount UDA pays a member under the base plan depends upon how much "base" a member owns. The amount that it pays a member under the overproduction program is a function of the member's past production.

## THE STATUTE

Arizona Revised Statutes section 10–716(C) and its related provisions read as follows:

A. The association and its members may make and execute marketing contracts requiring the members to sell, for any period of time not over ten years, all or any specified part of their agricultural products, or specified commodities, exclusively to or through the association or its facilities.

B. The membership contract may provide for membership for a longer period than ten years but not exceeding thirty years, if the contract provides opportunity to the members for withdrawal at least once each year.

C. *The contract may provide that the association may sell the products of its members, with or without taking title thereto, and pay to its members the average sale price based on grade and quantity, after deducting all necessary selling, overhead and other costs and expenses.*

D. When provided in the by-laws, the marketing contract may fix, as liquidated damages, specific sums to be paid by the member to the association upon the breach by him of any provision of the marketing contract regarding the sale or delivery or withholding of products, and that the member will pay all costs, premiums for bonds, expenses and fees if an action is brought upon the contract by the association, and such provisions shall be valid and enforceable in the courts.

E. In the event of a breach, or threatened breach, of the marketing contract by a member, the association may apply for an injunction to prevent the further breach of the contract, and to enforce specific performance thereof.

(Emphasis added.)

## THE BASE PLAN

Under UDA's base plan, a member holds or may purchase an amount of "base," which is measured in hundreds of pounds. The base plan generally assures a member that UDA will pay him a price referred to

as the "quota price" for an amount of milk equal to the amount of base that he holds. For any amount of milk produced in excess of the amount of base that a member holds, UDA pays a lower price, known as the "over-quota" price.

The amount of base that a member holds is not the final determinant of the price that he will receive for his milk. UDA's board of directors periodically adjusts the amount of base for which a member will receive the quota price. This is done by applying a "quota percentage of base."

Perhaps the most effective way to illustrate the operation of UDA's base plan is with Lueck's own example:

> Assume that a member holds 1,000 pounds of base; that the member's production for a 30–day period was 60,000 pounds; and that the quota percentage of base was 90%. The amount of milk for which a member will receive quota price is determined by multiplying the number of pounds of base held (1,000 pounds daily) times the number of days in the month (30 days) times the quota percentage of base (90%):
> 1,000 pounds daily × 30 days × 90% = 27,000 pounds

The member will receive the quota price for 27,000 pounds and the over-quota price for the remaining 33,000 pounds.[1] The quota and the over-quota price can vary from one another by as much as $1.25 to $2.50 per hundred weight.

## THE OVERPRODUCTION PROGRAM

Lueck characterizes the overproduction program as an extension of the base plan. When it was in effect, it worked as follows. UDA calculated each member's average production for the period from September through October of 1985, by dividing the total number of pounds that the member produced by the number of days in the two-month period. UDA used the "norm" thus established to calculate the amount that it would pay members from February to May of 1986. During that period, members received eight dollars per hundredweight for the amount of their production that exceeded the greater of their base or 120% of their average production during the period from September through October of 1985. UDA established a similar program in 1987 for the months of February to May.

## THE FEDERAL MARKETING ORDER

Federal statutes authorize the Secretary of Agriculture to regulate the marketing of milk. *See generally* 7 U.S.C.S. §§ 601–624 (Law. Co-op 1978 Supp.1988). Under the relevant regulation, known as Order 131, milk is classified according to the use that the handlers give it. 7 C.F.R. § 1131.40 (1988). Different prices are established for each class. 7 C.F.R. §§ 1131.50, 1131.51 (1988). Generally, Class I milk is the fluid product; Class II includes skim milk and butterfat that is disposed of in the form of fluid cream, cottage cheese, and other designated products; and Class III includes skim milk and butterfat that is used to produce cheese, butter, powdered milk, and still other designated products. 7 C.F.R. § 1131.40.

Each month, a federal administrator computes the total classified value of all of the milk that the producers in a designated marketing area have delivered to the handlers in that area. *See* 7 C.F.R. § 1131.60 (1988). (The term "producers" includes those who belong to cooperative marketing associations as well as those who do not. *See* 7 C.F.R. §§ 1131.12, 1131.18 (1988).) The administrator then computes a "blend price" or "uniform price." *See* 7 C.F.R. § 1131.61 (1988). This is a weighted average price per hundredweight. It is derived by dividing the total "classified value" of all of the milk that the producers have delivered by the total hundredweight of all of the milk that they have delivered. *See id.* Each month, all of the handlers in UDA's marketing area pay for all of the milk that the producers have delivered to

---

1. This example does not take into account premiums, adjustments, or differentials for butter-

fat content, protein content, or milk quality.

them. *See* 7 C.F.R. § 1131.73 (1988). The administrator then pays UDA, for distribution to its members, the aggregate "blend price" dollar value of all of the milk that UDA's members have delivered. *See* 7 C.F.R. § 1131.73(b) (1988).

## PROCEDURAL HISTORY

Lueck, a member of UDA, filed suit against UDA. Among other things, he sought a declaratory judgment that UDA's base plan and overproduction program violated A.R.S. section 10–716(C). Lueck eventually moved for partial summary judgment. On April 30, 1987, the trial court denied Lueck's motion, and *sua sponte* entered summary judgment in favor of UDA. The trial judge explained her ruling as follows:

> In this case UDA sold the products of its members. UDA paid its members (as a group) in accordance with § 10–716(C) keeping none of the money for itself and disbursing the proceeds to individual members in accordance with their contracts between each other and with UDA. There is no genuinely contested issue of material fact and the law favors the position of UDA on interpretation of § 10–716(C).

This appeal ensued.

## THE STATUTE DOES NOT REQUIRE UDA TO PAY ITS MEMBERS THE AVERAGE PRICE RECEIVED

Lueck acknowledges that the first portion of section 10–716(C) is permissive and that it "serves to allow a cooperative marketing association to enter into marketing contracts to sell the products of its members." However, he interprets the rest of section 10–716(C) as mandatory. He states that once a cooperative enters into marketing contracts, "it is *required* to pay its members the average sale price received by the cooperative for the products, based on grade and quantity of the members' production, after deducting necessary costs and expenses." (Emphasis added.) It is Lueck's contention that if section 10–716(C) is interpreted in this manner, UDA's base

plan and overproduction program violate its terms.

We must attempt to ascertain and carry out the intent of the legislature. *Collins v. Stockwell,* 137 Ariz. 416, 420, 671 P.2d 394, 398 (1983). In order to determine the legislature's intent, "we consider the context of the statute, the language used, the subject matter, the historical background, the effects and consequences, and the spirit and purpose of the law." *Arizona Newspapers Ass'n v. Superior Court,* 143 Ariz. 560, 562, 694 P.2d 1174, 1176 (1985). To that end, we quote from the original Cooperative Marketing Act, in which section 10–716(C) was first enacted. The Act's "Declaration of Policy" reads as follows:

> In order to promote, foster and encourage the intelligent and orderly marketing of agricultural products through cooperation and to eliminate speculation and waste; and to make the distribution of agricultural products as direct as can be efficiently done between producer and consumer; *and to stabilize the marketing problems of agricultural products,* this Act is passed.

Laws 1921, ch. 156, § 1 (emphasis added).

The production cycle for milk is inherently unstable. While demand remains constant, year-round production can be from fifty to one-hundred percent higher in the spring and summer than in the remaining seasons. Brooks, *The Pricing of Milk Under Federal Marketing Orders,* 26 Geo. Wash.L.Rev. 181 (1957). This results in a period of overproduction, which in turn results in marketing problems. *Id.* at 181–87. The Declaration of Policy indicates that the legislature meant the Act to "stabilize" these problems. We note that federal Order 131 is also aimed at promoting orderly marketing conditions. *See* Kessel, *Economic Effects of Federal Regulation of Milk Markets,* 10 J.L. & Econ., 51, 52–53 (1967). UDA's base plan and overproduction program are in keeping with this goal because they are designed to discourage overproduction and to make it more economically feasible to produce milk. *See Van Huss v. Associated Milk Producers, Inc.,* 415 F.Supp. 356, 358–59 (N.D.Tex.

1976); *Thude v. United Dairymen of Arizona,* 17 Ariz.App. 168, 169, 496 P.2d 594, 595 (1972).

Lueck interprets A.R.S. section 10–716(C) as mandating that UDA pay proceeds to its members on the basis of "the average sale price based on grade and quantity." Lueck argues that if this portion of the statute is interpreted as mandatory, it prohibits UDA from paying its members in accordance with its base plan or overproduction program. We believe that such an interpretation, with its resulting limitation on UDA's attempts to control production, would vitiate the legislature's stated intent of stabilizing marketing problems.

Lueck contends that UDA presented no evidence which would suggest that its base plan and overproduction program were meant to promote public policy by creating disincentives to overproduction. He further contends that this court cannot properly consider case law supporting UDA's position because the cases in question were decided on the basis of factual records and evidence that was peculiar to them. We disagree. We think it permissible to consider the intent of the plans that those cases discuss. We further think that the purpose of the base plan and the overproduction program is self-evident. As this court has previously recognized, the primary purpose of the UDA itself is "the avoidance of both spoilage and surplus." *Thude,* 17 Ariz.App. at 169, 496 P.2d at 595.

Lueck argues that if the base plan and the overproduction program were in fact intended to control production, they have failed in their goal. In support of this contention, he cites *Base Plans in U.S. Milk Markets: Development, Status and Potential,* Marketing Research Report No. 1957, U.S. Department of Agriculture, Economic Research Service, at 26–31 (1972). He also argues that UDA's price schemes act as a barrier to prevent new producers from entering the market and that they promote windfall profits for UDA's existing members.

We cannot say what the actual effects of the base plan and the overproduction program are, but we are certain of their intended results. The legislature enacted the Cooperative Marketing Act in order "to stabilize ... marketing problems." Laws 1921, ch. 156, § 1. A permissive interpretation of A.R.S. section 10–716(C) allows UDA to continue with its base plan and overproduction program. We therefore believe that any other interpretation would be contrary to legislative intent.

When the Arizona Cooperative Marketing Act was originally enacted in 1921, its title stated in relevant part that the Act was one "*Regulating* Sales and Methods of Disbursement of Proceeds." Laws 1921, ch. 156 (emphasis added). Lueck contends that the phrase "regulating ... methods of disbursement of proceeds" can only refer to the provision of the Act concerning payment of the average price received. If the phrase does not refer to that provision, the argument goes, the phrase is meaningless. Our interpretation of the statute, however, still accords the phrase some office. Even if the language concerning payment of the average price received is permissive, the Act still regulates disbursements in that it forbids the cooperative from making a profit on its activities. Furthermore, even if that interpretation were incorrect, we would still give the Act's Declaration of Policy greater weight than its title in divining the legislature's intent.

Lueck states that we must read section 10–716(C) in conjunction with related statutory provisions. We agree. *See Grant v. Board of Regents of Univs. & State Colleges,* 133 Ariz. 527, 529, 652 P.2d 1374, 1376 (1982). Pursuant to A.R.S. section 10–703(B), cooperative marketing associations are prohibited from making profits for themselves or for their members other than in the members' capacity as producers. Lueck argues that in light of this statute, A.R.S. section 10–716(C) must be read as mandating that cooperatives pay members the average sale price based on grade and quantity and that they only deduct necessary costs. We are not persuaded by Lueck's reference to A.R.S. section 10–703(B). It is not necessary to interpret A.R.S. section 10–716(C) as mandatory

to prevent a cooperative from making a profit. By the same token, a permissive interpretation of A.R.S. section 10–716(C) does not preclude Lueck from suing under the statute that prohibits cooperatives from making such profits.

A reading of subsection (C) in conjunction with other parts of section 10–716 suggests that the subsection is permissive. For example, A.R.S. section 10–716(E) provides that "[i]n the event of a breach ... of the marketing contract by a member, the association may apply for an injunction to prevent the further breach of the contract, and to enforce specific performance thereof." Lueck's interpretation would require an association to enforce the contract by specific performance once it had applied for an injunction.

Arizona Revised Statutes section 10–716(B) states that "[t]he membership contract *may* provide for membership for a longer period than ten years but not exceeding thirty years, *if* the contract provides opportunity to the members for withdrawal at least once each year." (Emphasis added.) This demonstrates the legislature's ability to mandate a condition of the marketing contract. Had the legislature wished to make A.R.S. section 10–716(C) mandatory, it could easily have used language that would have made its intent plain.

Elsewhere within the same statutory scheme, the legislature has used the verb "shall" when it intended to make a provision mandatory. *E.g.*, A.R.S. § 10–702 ("Any law in conflict ... shall not apply"); § 10–703(B) ("Associations organized under this article shall not make profits"); § 10–704(A) ("Articles of incorporation shall be filed"); § 10–706(A) (Supp.1988) ("Each association shall ... adopt by-laws"); § 10–707 ("The property rights ... of each member ... shall be set forth in the by-laws"), § 10–710 (Supp.1988) ("If a member withdraws ... the board of directors shall ... equitably appraise his property interest"); § 10–711(A) (Supp. 1988) ("The affairs of the association shall be managed by the board of directors"); § 10–712 ("The directors shall elect ... a president"); § 10–714 ("The by-laws shall provide for one or more regular meetings"); § 10–715 ("[A]ny matter that has been approved ... by the board shall be referred to the membership"); § 10–719 ("The association shall make an annual report"); § 10–720 ("Each association shall pay an annual license fee"); § 10–722 ("An association shall not be deemed to be a combination in restraint of trade").

Lueck argues that section 10–716(C) must be strictly construed because Arizona agricultural cooperatives are exempt from certain state and federal anti-trust regulations and their activities are not considered to be in restraint of trade. We do not dispute Lueck's contention. However, a strict construction of the statute does not necessarily equate with a mandatory interpretation of it.

Lueck cites section 10–716(C) as it was originally enacted. The section originally stated that contracts between the association and its members "may provide that the association may sell or resell the products of its members, with or without taking title thereto; and pay over to its members the average resale price based on grade and quantity...." Laws 1921, ch. 156, § 15. Lueck believes that the use of a semicolon between the two clauses of the 1921 statute demonstrates that the legislature intended the first clause to be permissive and the second mandatory. He further contends that the use of the conjunctive term "and" in the present statute without a permissive term before the verb "pay" supports his mandatory interpretation of that portion of A.R.S. section 10–716(C). He cites no legal or grammatical authority in support of these conclusions.

Lueck maintains that statutes should be interpreted, wherever possible, so that no clause is rendered superfluous. We agree. *Union Rock & Materials Corp. v. Scottsdale Conference Center*, 139 Ariz. 268, 271, 678 P.2d 453, 456 (App.1983). Lueck argues that unless section 10–716(C) is interpreted to *require* payment of the average sale price based on grade and quantity, the statute would be superfluous. A statute may, however, be merely suggestive.

*See Arizona Downs v. Arizona Horsemen's Found.*, 130 Ariz. 550, 554, 637 P.2d 1053, 1057 (1981) (holding that a statute, even if it contains the word "shall," may be interpreted to indicate desirability, preference, or permission).

Lueck cites *Sullivan v. Metro Productions, Inc.*, 150 Ariz. 573, 724 P.2d 1242 (App.1986), *cert. denied sub nom. Miller v. Sullivan*, 479 U.S. 1102, 107 S.Ct. 1334, 94 L.Ed.2d 185 (1987), as an analogy that sheds light on what he believes to be the proper construction of section 10–716(C). In that case, Division II of our court interpreted A.R.S. section 13–2314(A), which provides in relevant part as follows:

> A person who sustains injury to his person, business or property by racketeering as defined by § 13–2301, subsection D, paragraph 4 or by a violation of § 13–2312 *may* file an action in superior court for the recovery of treble damages....

(Emphasis added.)

The court held that the award of treble damages in favor of a successful plaintiff was mandatory. *Sullivan*, 150 Ariz. at 577–78, 724 P.2d at 1246–47. It found that while the word "may" served as an auxiliary verb to the verb "file," it did not alter the clause that mandated treble damages. *Id.* at 578, 724 P.2d at 1247. Applying *Sullivan* to A.R.S. section 10–716(C), Lueck reasons that the word "may" is an auxiliary verb to the verbs "provide" and "sell," but that it does not affect the mandatory portion of section 10–716(C), which requires payment based on the average sale price.

Lueck also cites *Gallatin Farmers Co. v. Commissioner of Internal Revenue*, 132 F.2d 706 (9th Cir.1942), a case that interpreted a Montana statute as permissive in part and mandatory in part. The Montana statute provided as follows:

> The directors of a co-operative association, subject to revision by the stockholders at a general or special meeting may *apportion* the earnings of the association by *first* paying dividends on the paid up captial stock, not exceeding six per cent (6%) per annum on the par value

thereof, from the remaining funds, if any, accessible for dividend purposes, not less than five per cent (5%) of the net profits for a reserve fund until an amount has accumulated in said reserve fund amounting to thirty percent (30%) of the paid up capital stock, *and from the balance*, if any, five per cent (5%) for educational fund to be used for teaching co-operation, *and the remaining of said profits, if any*, by uniform dividends upon the amount of purchases of patrons and upon the wages and for salaries of employees, the amount of such uniform dividends on the amount of their purchases, which may be credited to the account of such patrons on account of capital stock of the associations;....

132 F.2d at 708 (emphasis added by that court).

The Ninth Circuit Court of Appeals held that the directors could not pay a "patronage rebate" to purchasers of the cooperative's milk. *Id.* at 708–09. The court stated that once the directors had decided to apportion earnings, "they must follow the statutory method of apportionment." *Id.* at 708.

We do not find Lueck's citation to *Sullivan* persuasive. The statute there clearly created a cause of action for treble damages. In *Gallatin*, any result other than the one that the court reached would have resulted in an absurdity, *i.e.*, the association could have totally ignored its stockholders. 132 F.2d at 708–09.

Lueck contends that if the Arizona legislature had intended section 10–716(C) to be permissive, it would have enacted a statute similar to Oklahoma's. The Oklahoma statute in question provides that cooperatives may enter into marketing agreements with their members, "upon such terms as may be provided in said agreement." Okla. Stat. Tit. 2, § 343 (West 1981). As further support for his interpretation, Lueck refers to the clause in section 10–716(C) that allows a cooperative to sell its members' products "with or without taking title thereto." Lueck maintains that if the legislature had intended the statute to be wholly permissive, it would have written it

to read as follows: "[W]ith or without paying to its members the average sale price based on grade and quantity."

We agree that the Oklahoma statute is clearly permissive, and we concede that our own statute would be clearer if the legislature had included the words "with or without." However, in light of the legislative intent expressed in the Act's Declaration of Policy and in its overall statutory scheme, we are convinced that section 10–716(C) is permissive in whole and not mandatory in part.

Because we interpret section 10–716(C) as wholly permissive, we hold that UDA's base plan and overproduction program do not violate it. The decision of the trial court is affirmed.

CONTRERAS, Acting P.J., and SHELLEY, J., concur.